# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| TIMOTHY HOLLAHAN and JENNIFER HOLLAHAN, <br><br>     Plaintiffs, <br><br> v. <br><br> THE STANDARD FIRE INSURANCE COMPANY, <br><br>     Defendant. | No. 3:14-cv-00001 <br> Senior Judge Haynes |

## M E M O R A N D U M

Plaintiffs, Timothy Hollahan and wife Jennifer Hollahan, Tennessee citizens, originally filed this action in Chancery Court of Davidson County, Tennessee, against Defendant The Standard Fire Insurance Company, a Connecticut corporation, for breach of contract, violation of the Tennessee Consumer Protection Act Tenn. Code Ann. §§ 47-18-101 et seq., bad faith refusal to pay under Tenn. Code Ann. § 56-7-105, negligence and unjust enrichment. Defendant removed the action to this Court under 28 U.S.C. § 1332, the federal diversity statute, without objection.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 45), contending that Plaintiffs' breach of contract claim is time-barred by the one year suit limitation contained in the policy; that Plaintiffs breached the policy by failing to comply with certain conditions precedent for coverage, such as the policy's mandatory cooperation clause that prevented Defendant from completing its investigation; that Plaintiffs' damages are barred under several of the policy's provisions; that Plaintiffs cannot establish the requirements under Tennessee's bad faith statute; and that Plaintiffs cannot recover any extra-contractual damages because Tennessee's bad

faith statute provides the exclusive contractual remedy for an insurer's bad faith refusal to pay on a policy.

In response, Plaintiffs contend that their breach of contract claim is timely, or alternatively, that Defendant is estopped from relying on the suit limitation defense; that they did not breach the cooperation clause; that there are issues of fact as to whether Plaintiffs' damages are barred under the policy's provisions; that Plaintiffs can establish the requirements under the Tennessee bad faith statute; and that Plaintiffs' claims for extra-contractual damages are not barred by the Tennessee bad faith statute.

Also, before the Court is Defendant's motion to strike portions of Plaintiffs' affidavits (Docket Entry No. 63), contending that Timothy Hollahan's and Jennifer Hollahan's statements regarding cooperation with Defendant are unsupported by documentary evidence, factually incorrect, and contradictory to Plaintiffs' depositions. In response, Plaintiffs contend that Timothy and Jennifer Hollahan have personal knowledge of the facts set forth in their affidavits and that those facts are admissible.

For the reasons set forth below, the Court concludes that Defendant's motion to strike and Defendant's motion for summary judgment should be granted.

## A. Defendant's Motion to Strike

Defendant seeks to strike paragraph 16 in Timothy Hollahan's and Jennifer Hollahan's affidavits (Docket Entry Nos. 57-1 and 57-2), contending that Plaintiffs make contradictory and conclusory statements and refer to documents not attached to their affidavits. Paragraph 16 states:

> I cooperated with Mr. Ted Alexander and the Defendant's investigators and representatives of the Defendant to the extent possible in that I participated in the Examination Under Oath; I signed authorization and consent forms for the Defendant

2

to obtain our financial records and other documents they requested; and that I did everything possible in cooperating with the Defendant during the pendency of our claim.

Id.

Defendant asserts that Plaintiffs have not submitted any authorization or consent forms that they reference in their affidavits. According to Defendant, Plaintiffs executed three limited authorization forms: one dated May 11, 2011, that permitted Defendant to obtain Plaintiffs' credit report; one executed by Tim Hollahan on May 11, 2011, that allowed Defendant to obtain Plaintiffs' cellular telephone records from Verizon; and one dated December 28, 2011, that permitted Defendant to obtain records from SunTrust Bank. (Docket Entry No. 63-2 at 6, 7, 22). Defendant asserts that Plaintiffs did not provide Defendant with any other authorizations prior to the expiration of the policy's one year suit limitation provision on September 13, 2012.

In their response, Plaintiffs do not assert that they signed any other consent forms nor have they submitted any documentary evidence showing that they did so. Further, at the October 11, 2011 examination, Defendant's counsel advised Plaintiffs that because Verizon required Defendant to present a pass code to access Plaintiffs' cellular telephone records that Plaintiffs would therefore need to provide directly Plaintiffs' cellular telephone records to Defendant. (Docket Entry No. 48-1, Timothy Hollahan Examination Under Oath at 38-39; Docket Entry No. 48-9, Jennifer Hollahan Examination Under Oath at 29-30; Docket Entry No. 63-2 at 16). In a letter dated January 6, 2012, Defendant stated, in part, the following:

> As you are aware, Standard Fire has made repeated requests for you to produce documentation in support of the claim. You were requested to produce the documentation at your examinations under oath in October 2011, but you both failed to produce any documentation. You agreed to produce the documents following your examinations, and despite correspondence to you dated December 12, 2011, none of the requested documentation has been produced. As a condition precedent to

3

recovery, your policy requires that you provide Standard Fire with records and documents and permit it to make copies.

To confirm, Standard Fire has requested that you produce the following:

1.  Any and all other documentation of whatever kind or nature, including receipts which you can obtain, in order to verify the claim, including your sworn statement in proof of loss, which you have filed for this loss.

2.  Any and all estimates, receipts or invoices for the repair, replacement or removal of items lost or damaged, including costs related to the structure, contents, or other items.

3.  All documents related to any claim for Additional Living Expenses (past, present or future), including any documents you rely upon to claim any extraordinary circumstances.

4.  Copies of your personal income tax returns for the years 2009 and 2010, if filed.

5.  All bills, invoices, or other documentation of whatever kind or nature regarding maintenance, upkeep and repairs on the damaged structure for three (3) years prior to the date of loss.

6.  Your cell phone records, including text message and call history as well as cell tower information, from April 1, 2011 through April 30, 2011. You can obtain these directly from your cell phone provider.

(Docket Entry No. 48-18 at 35-36).

Plaintiffs, however, assert that they cooperated with Defendant's requests, citing the information submitted in their Amended Statement in Proof of Loss sent on June 17, 2013. Yet, as discussed infra, this submission was after the expiration of the one year suit limitation and after Plaintiffs' claim was denied on December 12, 2012. Further, Timothy Hollahan's affidavit stating that they cooperated "to the extent possible" is contradicted by his deposition testimony where he stated that he could not "recall what steps we took to recover the documents" requested by Defendant. (Docket Entry No. 48-14 Timothy Hollahan Deposition at 25-26). Timothy Hollahan

admitted that Plaintiffs could have called to obtain the requested cellular telephone records and tax returns, but could not recall if he attempted to do so. Id. at 26-27. Plaintiffs acknowledged that Plaintiffs did not respond to Defendant's January 12, 2012 letter until June 17, 2013. Id. at 34; Docket Entry No. 48-16, Jennifer Hollahan Deposition at 28. "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting earlier deposition testimony." Davidson & Jones Dev. Co. v. Elmore Dev. Co., 921 F.2d 1343, 1352 (6th Cir. 1991); Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 908 (6th Cir. 2006) ("[A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'") (citations omitted); Wingz & Thingz 1 v. Penn-Star Ins. Co., 547 F. App'x 766, 767 (6th Cir. 2013) (citing Bonds v. Cox, 20 F.3d 697, 703 (6th Cir.1994) ("'We do not believe that the standard of review for summary judgment ... requires us to ignore a party's own conflicting statements in construing a fact to her best advantage.'")).

Because Timothy Hollahan testified that he could not recall what steps were taken to obtain the requested documents, that Plaintiffs acknowledged that they could obtain the requested documents through third parties and that Plaintiffs did not respond to Defendant's January 6, 2012 letter until June 17, 2013, the Court concludes that Plaintiffs' statements that they cooperated "to the extent possible" is conclusory, vague and contradictory and should be stricken.

Accordingly, for the collective reasons stated above, the Court concludes that paragraph 16 in Plaintiffs' affidavits should be stricken.

## B. Findings of Fact[1]

In 2002, Plaintiffs Timothy and Jennifer Hollahan purchased property at 6526 Currywood Drive, in Nashville, Tennessee. (Docket Entry No. 1-1, Complaint at 2; Docket Entry No. 54, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶¶ 1-2). This property was the primary residence for Plaintiffs and their two daughters. (Docket Entry No. 1-1 at 4, 10; Docket Entry No. 54 at ¶ 4). Plaintiffs contracted with Defendant Standard Fire, an underwriting company for Traveler's Insurance, to issue an insurance policy for this property. (Docket Entry No. 54 at ¶ 1; Docket Entry No. 58-1, Ted Alexander Deposition at p. 9). That insurance policy provides, in relevant part:

### SECTION I – PERILS INSURED AGAINST

COVERAGE A DWELLING AND – COVERAGE B OTHER STRUCTURES

We insure against risks of direct physical loss to property described in **COVERAGE A and B, EXCEPT:**

\* \* \*

5. LOSS CAUSED BY VANDALISM AND MALICIOUS MISCHIEF OR BREAKAGE OF GLASS AND SAFETY GLAZING MATERIALS IF THE DWELLING HAS BEEN VACANT FOR MORE THAN 30 CONSECUTIVE

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes findings of facts.

DAYS IMMEDIATELY BEFORE THE LOSS. A DWELLING BEING CONSTRUCTED IS NOT CONSIDERED VACANT;

\* \* \*

## SECTION I – EXCLUSIONS

WE DO NOT COVER LOSS RESULTING DIRECTLY OR INDIRECTLY FROM:

\* \* \*

**8. INTENTIONAL LOSS**, MEANING ANY LOSS ARISING OUT OF ANY ACT COMMITTED:

(1) BY OR AT THE DIRECTION OF AN **INSURED**; and
(2) WITH THE INTENT TO CAUSE A LOSS.

LOSS OR DAMAGE EXCLUSIONS 1-8 APPLY ABOVE EVEN IF A COVERED PERIL IS A CONCURRENT CAUSE OF LOSS. Ensuing loss specifically accepted by the terms of this policy is covered.

## SECTION I – CONDITIONS

\* \* \*

**2. Your Duties After Loss**. In case of a loss to which this insurance may apply, you shall see that the following duties are performed:

\* \* \*

**e.** PREPARE AN INVENTORY OF DAMAGED PERSONAL PROPERTY SHOWING IN DETAIL THE:

**(1)** QUANTITY;
**(2)** DESCRIPTION;
**(3)** ACTUAL CASH VALUE; AND
**(4)** AMOUNT OF LOSS.

ATTACH TO THE INVENTORY ALL:

**(1)** BILLS;
**(2)** RECEIPTS; AND

**(3)** RELATED DOCUMENTS THAT SUBSTANTIATE THE FIGURES IN THE INVENTORY;

**f.** AS OFTEN AS WE REASONABLY REQUIRE:

**(1)** SHOW THE DAMAGED PROPERTY;
**(2)** PROVIDE US WITH RECORDS AND DOCUMENTS AND PERMIT US TO MAKE COPIES; AND
**(3)** SUBMIT TO EXAMINATION UNDER OATH, WHILE NOT IN THE PRESENCE OF ANY OTHER **INSURED** AND SIGN THE SAME;

**g.** SUBMIT TO US, WITHIN 60 DAYS AFTER WE REQUEST, YOUR SIGNED, SWORN STATEMENT OF LOSS WHICH SETS FORTH, TO THE BEST OF YOUR KNOWLEDGE AND BELIEF:

**(1)** THE TIME AND CAUSE OF LOSS;
**(2)** INTEREST OF THE **INSURED** AND ALL OTHERS IN THE PROPERTY INVOLVED AND ALL ENCUMBRANCES ON THE PROPERTY;
**(3)** OTHER INSURANCE WHICH MAY COVER THE LOSS;
**(4)** CHANGES IN TITLE OR OCCUPANCY OF THE PROPERTY DURING THE TERM OF THE POLICY;
**(5)** SPECIFICATIONS OF ANY DAMAGED BUILDING AND DETAILED ESTIMATES FOR REPAIR OF THE DAMAGE;
**(6)** AN INVENTORY OF DAMAGED PERSONAL PROPERTY DESCRIBED IN **2e.** ABOVE;
**(7)** RECEIPTS FOR ADDITIONAL LIVING EXPENSES INCURRED AND RECORDS SUPPORTING THE FAIR RENTAL VALUE LOSS;
**(8)** EVIDENCE OR AFFIDAVIT SUPPORTING A CLAIM UNDER THE CREDIT CARD, FUND TRANSFER CARD, FORGERY AND COUNTERFEIT MONEY COVERAGE, STATING THE AMOUNT AND CAUSE OF LOSS.

\* \* \*

**8. Suit Against Us.** No action shall be brought UNLESS THERE HAS BEEN COMPLIANCE WITH THE POLICY PROVISIONS AND THE ACTION IS STARTED WITHIN ONE YEAR AFTER THE OCCURRENCE CAUSING LOSS OR DAMAGE.

\* \* \*

**10. Loss Payment.** We will adjust all losses with you. We will pay you UNLESS SOME OTHER PERSON NAMED IN THE POLICY IN LEGALLY ENTITLED

TO RECEIVE PAYMENT. Loss will be payable 60 days after we receive your proof of loss and;

**a.** Reach agreement with you; or
**b.** There is an entry of a final judgment; or
**c.** There is a filing of an appraisal award with us.

\* \* \*

## SECTION I AND SECTION II – CONDITIONS

\* \* \*

**2. CONCEALMENT OR FRAUD.** THE ENTIRE POLICY WILL BE VOID IF, WHETHER BEFORE OR AFTER A LOSS, ANY **INSURED** HAS:

**a.** INTENTIONALLY CONCEALED OR MISREPRESENTED ANY MATERIAL FACT OR CIRCUMSTANCE;
**b.** ENGAGED IN FRAUDULENT CONDUCT; OR
**c.** MADE FALSE STATEMENTS; RELATED TO THIS INSURANCE.

(Docket Entry No. 48-17 at 32, 33, 35, 36-37, 38; Docket Entry No. 48-18 at 1).

During the summer of 2010, Timothy Hollahan began staying at his mother's condominium to provide care for her. (Docket Entry No. 54 at ¶ 3). After Thanksgiving in 2010, Jennifer Hollahan and her children went to live with Timothy Hollahan at his mother's condominium. Id. at ¶ 4. In late December 2010 or early January 2011, Jennifer Hollahan and her children moved into the home of Jennifer Hollahan's friend. (Docket Entry No. 48-7, Jennifer Hollahan Examination Under Oath at 17). Timothy Hollahan remained at his mother's condominium. Id. at 18.

After leaving the Currywood Drive property in November 2010, the Hollahans did not occupy the home on a daily basis or shower, sleep or eat meals there. (Docket Entry No. 54 at ¶ 7; Docket Entry No. 48-9, Jennifer Hollahan Examination Under Oath at 10-11). Timothy Hollahan

9

stated that their intention was not to move permanently from the Currywood Drive property. (Docket Entry No. 48-2, Timothy Hollahan Examination Under Oath at 8-9).

When asked how often Plaintiffs would go by the house to get the mail, Jennifer Hollahan testified, "Once sometimes -- sometimes, I would go by one week. It may be ten days before I would go by again. We didn't get that much mail." (Docket Entry No. 48-9, Jennifer Hollahan Examination Under Oath at 11-12). Plaintiffs also returned to feed feral cats that were living in the garage and around the house. (Docket Entry No. 48-8, Jennifer Hollahan Examination Under Oath at 10-11, 13). Plaintiffs left the garage door open about six inches so that the feral cats could enter the garage. Id. at 11.

Sometime just after January 1, 2011, Plaintiffs discovered that cats had entered into the house through an open door from the garage. Id. at 5-6; Docket Entry No. 48-2, Timothy Hollahan Examination Under Oath at 12-14. Timothy Hollahan testified that he saw cats running in and out of the garage area and could see through the window that they were inside the house. (Docket Entry No. 48-2 Examination Under Oath at 13). Timothy Hollahan stated that he did not go into the house to expel the cats because he was in "a bit of denial" and was "trying to avoid the situation." Id. Timothy Hollahan stated that he could not recall going back into the house in 2011. Id. at 12.

Jennifer Hollahan testified that either in February or sometime in the spring her husband went back inside the house and discovered extensive damage. (Docket Entry No. 48-8, Jennifer Hollahan Examination Under Oath at 6). According to Jennifer Hollahan, her husband stated that "[t]here was quite a mess" and that some of the mattresses were ruined. Id. at 12, 14. Jennifer Hollahan testified that she did not go back inside the house after learning about the cats from her husband, but that she continued to leave food outside for the cats. Id. at 13. The last time Jennifer Hollahan was at the

10

house was "[p]robably February-ish." (Docket Entry No. 48-9, Jennifer Hollahan, Examination Under Oath at 35). When asked when the last time she was physically inside the house, Jennifer Hollohan testified, "Physical that I went in the home is I remember when I got the Christmas ornaments" in 2010. Id. at 35-36, 11.

Yet, contrary to her testimony at her examination under oath on October 11, 2011, in her June 16, 2014 deposition, Jennifer Hollahan testified that from Thanksgiving 2010, until the April 13, 2011 fire, she physically went inside her house "[p]robably a dozen" times "[e]asy." (Docket Entry No. 48-15, Jennifer Hollahan Deposition at 17-18). Jennifer Hollohan stated that she "averaged two, maybe three times a month checking inside the house," conducting "a general casing, to make sure things looked right." Id. at 18. Jennifer Hollohan stated that the last time she was physically inside the house was "maybe mid-March, end of March." Id. at 18-19.

According to Jennifer Hollahan, in late March or early April 2011, her husband contacted a man about cleaning some of the damage caused by the cats. (Docket Entry No. 54 at ¶ 22). Also, at some point before April 2011, the cable, gas, and electric services were turned off due to Plaintiffs' non-payment of bills. (Docket Entry No. 54 at ¶ 29).

On April 13, 2011, a fire occurred at the Currywood Drive property. Id. at ¶ 30. Fire investigators found cat feces throughout the house on the floor, on countertops, on furniture, in bathrooms and in bathtubs. Id. at ¶ 25. Cat feces damaged personal property and the floor of the house. Id. at ¶ 59. Billy Deering, Assistant Fire Marshal with the Nashville Fire Department who investigated the fire, testified that "[t]here was cat feces everywhere in that house. You could not step hardly anywhere that you wasn't stepping in cat feces." (Docket Entry No. 60-3, Deering Deposition at p.122). Investigators found empty bowls and 36 empty cat food bags on the floors of

various rooms inside the house. (Docket Entry No. 54 at ¶ 26). Investigators also discovered at least

85 dead cats inside the house. Id. at ¶ 27. The cause of the fire was classified as incendiary. Id. at

¶ 31. Deering testified, "No doubt that it was an intentionally set fire." (Docket Entry No. 60-3

Deering Deposition at p.24). In a report dated April 26, 2011, Deering noted the following:

> A fire occurred in this one story, wood frame, single family dwelling. The structure
> was vacant and had not been lived in over two months. The electricity had been off
> for two weeks according to the owner, Timothy Hollahan. The rear middle bedroom
> was the room of origin of the fire. The homeowner stated had room had been his
> daughters bedroom. There were several area's were the fire burnt through the floor
> and a mattress also was totally consumed in the fire. It appeared an accelerate was
> used on the floor area. The fire burnt through the exterior window and also through
> the ceiling to the roof structure. Neighbors reported seeing a white van in the
> driveway before the fire. It has not been identified or verified as of yet. The owner
> stated he had a painter that was going to start painting the house, but did not know
> if he had been there on this day. The owner did not have any contact information on
> the painter. The owner was driving a white van when he arrived on the scene today,
> but stated he had not been to the property on the day of the fire. The house was full
> of cats and cat feces. The house appeared to have been uninhabitable pre-fire and the
> property owner confirmed that was the reason they had moved out. The owner also
> stated that the rear patio style doors were not locked. A window at the rear right side
> bedroom was also left open and the owner stated it was left that way. A blue cooler
> was found at the base of the window and the owner stated he used it to enter the
> window when he locked himself out ? The owners insurance is with Travelers and
> it already has been assigned to an Investigator. The cause of the fire was Incendiary
> and the Investigation is on going.

(Docket Entry No. 60-3, Deering Deposition at p.4; Docket Entry No. 36-4 at 26).

Plaintiffs reported the fire to Defendant on April 13, 2011. (Docket Entry No. 54 at ¶ 33).

On April 17, 2011, Defendant requested that Plaintiffs execute a "Sword Statement In Proof of Loss"

form. Id. at ¶ 34; Docket Entry No. 60-10 at 2-3.

On July 14, 2011, Plaintiffs submitted their proof of loss, but did not list the amounts they

were claiming under the insurance policy. (Docket Entry No. 54 at ¶ 35). Plaintiffs also did not

provide a complete inventory of personal property damaged by the fire. Id. at ¶ 36. Pursuant to the

insurance policy, Defendant requested that Plaintiffs submit to examinations under oath and to produce certain documents and information. Id. at ¶ 37. Plaintiffs, however, failed to produce the requested documents at the October 11, 2011 examinations, citing that documents were ruined in a car wreck. Id. at ¶ 39. Plaintiffs agreed to produce copies of the documents at a later date. Id. at ¶ 40. Plaintiffs also did not produce their 2009 and 2010 income tax returns, but promised to produce them to Defendant as well. Id. at ¶ 41. Timothy Hollahan stated that the tax returns would be easier to produce "than some of the other things." (Docket Entry No. 48-1, Timothy Hollahan Examination Under Oath at 32).

Timothy Hollahan explained that Plaintiffs were unable to make a complete list of the property that was damaged and that they would need to do it by memory because the fire marshal advised them not to go back into the house and that "either fire or smoke damage had destroyed everything." Id. at 21-22. Timothy Hollohan testified that Defendant did not prevent him from going into the house. (Docket Entry No. 48-12 at 27). When asked if Plaintiffs had in their "possession any list that you-all have done by memory of all the items that were in the home that were damaged by the fire," Timothy Hollahan answered, "No." (Docket Entry No. 48-1, Timothy Hollahan Examination Under Oath at 22). Defendant advised Timothy Hollahan that it was asking Plaintiff to do so. Id.

Jennifer Hollahan testified that Defendant's adjuster, Ted Alexander, informed her that he could not fill out the forms listing the amount of damages Plaintiffs claimed, but that under the policy Plaintiffs were required to provide that information themselves. (Docket Entry No. 48-8, Jennifer Hollahan Examination Under Oath at 1, 4; Docket Entry No. 58-1, Alexander Deposition at p. 65; Docket Entry No. 48-16, Jennifer Hollahan Deposition at 28-29). Jennifer Hollahan also

stated that Alexander would not answer whether the house was safe to enter and Plaintiffs did not go into the house because they were unsure if the house was structurally safe to enter. (Docket Entry No. 48-8, Jennifer Hollahan Examination Under Oath at 2-4). Plaintiffs were able to look through the windows to see what might have been damaged by the fire. Id. at 5. Jennifer Hollahan also stated that she and her husband did attempt to list by memory items that may have been damaged by the fire. Id. at 5.

In a letter dated October 28, 2011, Defendant renewed its request that Plaintiffs produce the missing documents. (Docket Entry No. 54 at ¶ 42). Defendant also rejected Plaintiffs' July 14, 2011 proof of loss and asked that Plaintiffs submit another proof of loss within sixty days. Id. at ¶ 43. Defendant added, "Needless to say, all parties continue to insist on the strict compliance of the terms and/or conditions of the policy and applicable law." (Docket Entry No. 48-18 at 28).

On December 12, 2011, Defendant notified Plaintiffs by letter that they had not provided certain documents related to the October 11, 2011 examinations and requested that Plaintiffs provide these documents within fourteen days. Id. at 29. Defendant also reminded Plaintiffs that their proof of loss and contents inventory were due on or before December 28, 2011. Id. On January 1, 2012, Plaintiffs faxed their proof of loss, dated December 28, 2011, to Defendant. (Docket Entry No. 54 at ¶ 45). Plaintiffs did not complete an inventory of contents, only writing "N/A" on the form. Id. at ¶ 46; Docket Entry No. 48-18 at 32-33.

On January 6, 2012, Defendant rejected the December 28, 2011 proof of loss because Plaintiffs failed to provide any documentation supporting the amount of loss claimed. (Docket Entry No. 54 at ¶ 47). Defendant requested that a revised proof of loss be submitted within thirty days.

Id. at ¶ 48. Defendant also advised Plaintiffs that their continued failure to produce the requested documents may be grounds for denial of their claim. Id. at ¶ 49. Defendant stated:

> As you are aware, Standard Fire has made repeated requests for you to produce documentation in support of the claim. You were requested to produce the documentation at your examinations under oath in October 2011, but you both failed to produce any documentation. You agreed to produce the documents following your examinations, and despite correspondence to you dated December 12, 2011, none of the requested documentation has been produced. As a condition precedent to recovery, your policy requires that you provide Standard Fire with records and documents and permit it to make copies.
>
> To confirm, Standard Fire has requested that you produce the following:
>
> 1. Any and all other documentation of whatever kind or nature, including receipts which you can obtain, in order to verify the claim, including your sworn statement in proof of loss, which you have filed for this loss.
>
> 2. Any and all estimates, receipts or invoices for the repair, replacement or removal of items lost or damaged, including costs related to the structure, contents, or other items.
>
> 3. All documents related to any claim for Additional Living Expenses (past, present or future), including any documents you rely upon to claim any extraordinary circumstances.
>
> 4. Copies of your personal income tax returns for the years 2009 and 2010, if filed.
>
> 5. All bills, invoices, or other documentation of whatever kind or nature regarding maintenance, upkeep and repairs on the damaged structure for three (3) years prior to the date of loss.
>
> 6. Your cell phone records, including text message and call history as well as cell tower information, from April 1, 2011 through April 30, 2011. You can obtain these directly from your cell phone provider.
>
> Please provide these documents within the next 30 days. Your continued failure to produce the requested documents may be grounds for denial of your claim.
>
> Also be advised that Standard Fire's investigation has determined that the cause of the fire was incendiary. We understand from Metro Code that it is in the process of demolishing the house, but Standard Fire is in no position to stop that process.

Therefore, if you desire to retain any of the fire evidence you should immediately take any necessary steps to do so.

(Docket Entry No. 48-18 at 35-36).

Defendant reiterated, "Needless to say, all parties continue to insist on the strict compliance of the terms and/or conditions of the policy and applicable law." Id. at 36.

On June 14, 2012, the Metropolitan Nashville Department of Codes and Building Safety had Plaintiffs' house on Currywood Drive demolished as the structure was unfit for human habitation. (Docket Entry No. 54 at ¶ 56; Docket Entry No. 45-22 at 8, 10-11).

On December 12, 2012, Defendant denied Plaintiffs' claim based on their failure to cooperate with the investigation. (Docket Entry No. 54 at ¶ 50). Defendant stated that it "has not reached a final decision regarding any other issue related to your claim, since any other issue has now become moot. . . . Standard Fire does not intend . . . to waive any other provision or defenses and specifically reserve its rights to assert such additional policy provisions or defenses at any time." (Docket Entry No. 48-18 at 40).

On January 16, 2013, Plaintiffs made a demand for payment. (Docket Entry No. 54 at ¶ 63). On June 17, 2013, Plaintiffs produced their "Amended Sworn Statement and Proof of Loss" to Defendant. (Docket Entry No. 48-19 at 5). Plaintiffs testified that they determined which items to include on the contents inventory list by memory and did not rely on any photographs of the house supplied by Defendant. (Docket Entry No. 48-13, Timothy Hollohan, Deposition at 26; Docket Entry No. 48-16, Jennifer Hollohan, Deposition at 11-12). Plaintiffs admit that they did not respond to Defendant's January 12, 2012 letter until June 17, 2013. (Docket Entry No. 48-14, Timothy Hollahan Deposition at 34; Docket Entry No. 48-16, Jennifer Hollahan Deposition at 28).

On November 26, 2013, Plaintiffs filed this action in Davidson County, Tennessee Chancery Court. (Docket Entry No. 54 at ¶ 52; Docket Entry No. 1-1 at 1-24). On January 2, 2014, this action was removed to this Court. (Docket Entry No. 1).

Defendant contends that prior to December 12, 2012, Plaintiffs never submitted a complete proof of loss with supporting documentation along with the previously requested documents. (Docket Entry No. 54 at ¶ 51). Plaintiffs dispute this assertion and contend that, to the extent possible, they produced supporting documents for their claim prior to December 12, 2012. (Docket Entry No. 57-4 at 11). Plaintiffs cite that many of their financial records were destroyed in the April 13, 2011 fire. Id. at 10.

### C. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in original). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's

18

burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex, 477 U.S. at 323 and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

. . . .

    Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict — "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the <u>onus</u> of proof is imposed."

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted).

    It is likewise true that:

    In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986).

    The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

    A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule

56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party has "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff has presented sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law.

As a diversity action, Plaintiffs' claims are governed by state law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). The parties agree that Tennessee law governs Plaintiffs' claims.

"Insurance contracts are subject to the same rules of construction and enforcement as apply to contracts generally." McKimm v. Bell, 790 S.W.2d 526, 527 (Tenn. 1990) (citation omitted). "[C]ourts may not rewrite an insurance policy because the court dislikes its terms or because its provisions have harsh results." Imperial Park, LLC v. Penn-Star Ins. Co., – F.Supp.3d – , 2015 WL 5617226, at *20 (M.D. Tenn. Sept. 24, 2015) (citing Black v. Aetna Ins. Co., 909 S.W.2d 1 (Tenn. Ct. App. 1995)).

Defendant asserts that Plaintiffs' claim is time barred under the one year suit limitation provided in the insurance policy. Specifically, Defendant contends that under Tennessee law the suit limitation did not begin to run until September 13, 2011, sixty days after Defendant received Plaintiffs' proof of loss on July 14, 2011. Defendant therefore contends that Plaintiffs' one year suit limitation expired on September 13, 2012, making Plaintiffs' November 26, 2013 complaint time barred. In response, Plaintiffs contend that Defendant's conduct caused them to delay filing suit and therefore the suit limitation was tolled until December 12, 2012, when Defendant notified Plaintiffs that their claim was denied for failure to cooperate.

In Tennessee, "an insurance policy can establish an enforceable, agreed-upon limitations period in which a lawsuit can be filed." Burton v. Nationwide Ins. Co., No. 1:07-cv-129, 2007 WL 3309076, at *2 (E.D. Tenn. Nov. 6, 2007) (citing Brick Church Transmission, Inc. v. Southern Pilot Ins. Co., 140 S.W.3d 324, 329 (Tenn.Ct.App.2003)). Here, the insurance policy required the insured to file an action "within one year after the occurrence causing loss or damage." (Docket Entry No. 48-17 at 38). This one-year suit limitation is reasonable. Beahm v. Auto Owners Ins. Co., No. 3:13-CV-160-JMH, 2013 WL 3976622, at *2 (E.D. Tenn. Aug. 2, 2013) ("Although contractual

limitations periods must provide the insured with a reasonable time to bring suit, there is no question under Tennessee law that a one-year contractual statute of limitations period is reasonable.").

"[A] contractual limitations period begins to run upon accrual of the cause of action." Certain Underwriter's at Lloyd's of London v. Transcarriers Inc., 107 S.W.3d 496, 499 (Tenn. Ct. App. 2002) (citations omitted). "The accrual date varies depending upon the language of the policy and the actions of the insured and insurer in relation to that policy." Burton, 2007 WL 3309076, at *3. If a proof of loss is not filed, "the insured's cause of action accrues when the insurer denies the claim." Id. Yet, if a proof of loss is filed, "the contractual statute of limitations begins to run upon denial of liability or upon expiration of the immunity period, whichever comes first." Certain Underwriter's, 107 S.W.3d at 500; Burton, 2007 WL 3309076, at *3.

"An 'immunity period' (or 'settlement period') is a contractually-created period of time during which an insurer is immune from litigation while it investigates, evaluates, and may negotiate to settle the claim." Burton, 2007 WL 3309076, at *3; Meyers v. Farmers Aid Ass'n of Loudon Cty., No. E2013-02585-COA-R9-CV, 2014 WL 6889643, at *3 (Tenn. Ct. App. Dec. 9, 2014) ("Because the settlement period provides a period of immunity, during which the insured may not bring suit, the cause of action has been construed as accruing once the immunity period has expired, rather than on the date of the actual loss."). Here, the insurance contract provided a sixty-day immunity period. See Burton, 2007 WL 3309076, at *3, 4 (concluding that the insurance contract provided a sixty-day immunity period, the court stated, "Here, the policy creates a similar provision under '5. Loss Payment,' i.e. 'c) ... Payment will be made within 60 days after we review your proof of loss and: (1) reach agreement with you; or (2) there is an entry of a final judgment; or (3) there is a filing of an appraisal award with us.'").

24

Plaintiffs submitted their first proof of loss on July 14, 2011. Thus, the immunity period expired sixty days after submission of the proof of loss, on September 12, 2011. The one year suit limitation then ran until September 12, 2012. Plaintiffs filed this action in Davidson County Chancery Court on November 26, 2013, over fourteen months after the suit limitation expired. Therefore, Plaintiffs' claim is time-barred.

Plaintiffs contend that the one year suit limitation was tolled because Defendant's conduct induced Plaintiffs' delay in filing suit before December 12, 2012. Specifically, Plaintiffs contend that they relied upon the conduct and actions of Ted Alexander, that their claim was under advisement, was being considered and was still under investigation. Plaintiffs assert that because Defendant did not disclose the investigation report regarding the damage to their property and the cause of the fire, Plaintiffs were led to believe that their claim was open as no official denial of their claim was made by Alexander prior to December 12, 2012.

The time for performance under a contract may be waived by parties. Bokor v. Holder, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986). "[T]o constitute a waiver of a condition of a contract, there must be consideration or an element of estoppel." Id. Thus, by its conduct, a party may be estopped to rely on a statute of limitations. Brick Church, 140 S.W.3d at 335.

> Where by promises or appearances one party is induced to believe that the other party is going to pay a claim or otherwise satisfy the claims of the first party, and in reliance on that representation the first party delays filing suit within the applicable statute of limitations, the party making the representations may be estopped to raise the statute of limitations as a defense.

Sparks v. Metro. Gov't of Nashville, 771 S.W.2d 430, 433 (Tenn. Ct. App. 1989).

The party asserting equitable estoppel bears the burden of proof. Redwing v. Catholic Bishop for Diocese of Memphis, 363 S.W.3d 436, 460 (Tenn. 2012). To establish equitable estoppel, the

party asserting equitable estoppel must show the following elements as to the party against whom

estoppel is asserted:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.

Osborne v. Mountain Life Ins. Co., 130 S.W.3d 769, 774 (Tenn. 2004) (quoting Consumer Credit

Union v. Hite, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990) (citations omitted)). The party asserting

estoppel must also prove: "'(1) Lack of knowledge and of the means of knowledge of the truth as

to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based

thereon of such a character as to change his position prejudicially.'" Id. (quoting Consumer Credit

Union, 801 S.W.2d at 825).

Thus, after a defendant has established a statute of limitations defense, "the plaintiff must

demonstrate that the defendant induced him or her to put off filing suit by identifying specific

promises, inducements, suggestions, representations, assurances, or other similar conduct by the

defendant that the defendant knew, or reasonably should have known, would induce the plaintiff to

delay filing suit." Redwing, 363 S.W.3d at 460. The plaintiff must further "'demonstrate that [his

or her] delay in filing suit was not attributable to [his or her] own lack of diligence.'" Id. (citation

omitted).

The Tennessee Supreme Court has stated:

> The doctrine of equitable estoppel applies only when the defendant engages in misconduct. Examples of circumstances which have prompted the courts to invoke the doctrine of equitable estoppel to prevent a defendant from asserting a statute of limitations defense include: (1) when a defendant promises not to assert a statute of limitations defense, (2) when a defendant promises to pay or otherwise satisfy the

26

plaintiff's claim without requiring the plaintiff to file suit, and (3) when a defendant promises to settle a claim without litigation following the conclusion of another proceeding between the defendant and a third party.

In the context of defenses predicated on a statute of limitations, the doctrine of equitable estoppel always involves allegations that the defendant misled the plaintiff. The focus of an equitable estoppel inquiry "is on the defendant's conduct and the reasonableness of the plaintiff's reliance on that conduct." Determining whether to invoke the doctrine of equitable estoppel to counter a statute of limitations defense requires the courts to examine the facts and circumstances of the case to determine whether the defendant's conduct is sufficiently unfair or misleading to outweigh the public policy favoring the enforcement of statutes of limitations.

Plaintiffs asserting equitable estoppel must have acted diligently in pursuing their claims both before and after the defendant induced them to refrain from filing suit. The statute of limitations is tolled for the period during which the defendant misled the plaintiff.

Id. at 460-61 (citations and footnotes omitted). "The courts should not be too quick to invoke the doctrine of equitable estoppel to prevent a defendant from asserting an otherwise valid statute of limitations defense." Hardcastle v. Harris, 170 S.W.3d 67, 84 (Tenn. Ct. App. 2004).

Here, Plaintiffs fail to cite any specific statements, promises or representations by Alexander that induced Plaintiffs to refrain from filing suit within the applicable suit limitations. Mr. Hollahan testified that he did not have any communications with Alexander. (Docket Entry No. 48-14 at 28-29). Mrs. Hollahan stated that she attempted to contact Alexander on four occasions between January 1, 2012 and December 12, 2012, but only communicated with him on two of them, in November and December 2012. Id. at 23-30. During the two telephone calls, Mrs. Hollahan stated that she inquired about their claim and Alexander advised that he would send Plaintiffs a letter. Id. at 29-30. Plaintiffs do not cite any other communications between Alexander and Plaintiffs that support equitable estoppel. Further, following Plaintiffs' examinations under oath, all of Defendant Standard Fire's further communications to Plaintiffs specifically informed them that "all parties

continue to insist on the strict compliance of the terms and/or conditions of the policy and applicable law." (Docket Entry No. 48-18 at 28, 29, 36).

Plaintiffs do not cite any "specific promises, inducements, suggestions, representations, assurances, or other similar conduct that the defendant knew, or reasonably should have known, would induce the plaintiff to delay filing suit," Redwing, 363 S.W.3d at 460, or demonstrate that their delay in filing suit was not attributable to their own lack of diligence. Id.; see Roberts v. Allstate Ins. Co., No. 2:09-0016, 2009 WL 2851017 (Tenn. Ct. App. Aug. 29, 2009); Honeycutt v. Wilkes, McCullough and Wagner, No. W2007-00185-COA-R3-CV, 2007 WL 2200285 at *1-2 ("[C]ourts have refused to apply equitable estoppel when there is no evidence that the plaintiff's failure to bring the action was attributable to deception or misconduct on the part of the defendant that was specifically designed to prevent the plaintiff from timely filing his complaint.") (citing Yater v. Wachovia Bank of Georgia, N.A., 861 S.W.2d 369, 372 (Tenn. Ct. App. 1993) ("Ongoing negotiations between Plaintiff and his bank did not justify application of equitable estoppel, when there was no evidence that bank induced Plaintiff to forego any legal action until after the statute of limitations had run.")); Spar Gas, Inc. v. McCune, 908 S.W.2d 400, 404 (Tenn. Ct. App. 1995) ("We do not believe that reliance upon erroneous legal advice can operate to toll the statute of limitations"); Brick Church, 140 S.W.3d at 335-36 (the record did not support estoppel where the record showed no action by either party "between the June 27, 2000 letter by the insurer demanding production of documents and the expiration of the limitation of action period on May 4, 2002."); Murphy v. Allstate Indemnity Co., No. 1:13-CV-108, 2014 WL 1024165, at *3 (E.D. Tenn. March 17, 2014) (contract did not require defendant to remind plaintiffs about the limitations period closing

and further, "[i]f limitations periods were to toll merely because further negotiations, inspections, and adjustments occur, it would defeat the purpose of the limitations period.").

Accordingly, the Court concludes that the record does not support Plaintiffs' assertion of estoppel and Plaintiffs' contract claims should therefore be dismissed. See Murphy, 2014 WL 1024165, at *4 ("Once the clock on the limitations period started ticking, Plaintiffs had a series of choices regarding whether to keep negotiating, whether to invoke certain provisions of the contract, and, particularly as the limitations period drew to a close, whether to file a law suit. Because Plaintiffs waited too long to invoke the last option, the Court must dismiss their contract claims.").

Moreover, the Court concludes that based upon the undisputed facts Plaintiffs' contract claims are precluded because Plaintiffs failed to cooperate with Defendant as required by the policy.

"Tennessee courts have consistently upheld clauses requiring insureds to cooperate with their insurance companies." State Auto Ins. Co. v. Bishop, No. M199800900COAR3CV, 2000 WL 279940, at *4 (Tenn. Ct. App. Mar. 16, 2000): These clauses are considered conditions precedent. Id. As the Tennessee Court of Appeals has explained:

> The reason for including a cooperation clause in the policy and for conducting examinations pursuant to it is obvious enough. The company is entitled to obtain, promptly and while the information is still fresh, "all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights to enable them to decide upon their obligations, and to protect them against false claims."

Shelter Ins. Companies v. Spence, 656 S.W.2d 36, 38 (Tenn. Ct. App. 1983) (citation omitted). Thus, "[m]anifestly, the obtaining of true and accurate information about the type and extent of damage to the insured premises and its contents is relevant and material." Id.

"[A] breach of the clause substantially affecting the insurer's interests constitutes a complete defense to liability under the policy." Talley v. State Farm Fire & Cas. Co., 223 F.3d 323, 325 (6th Cir. 2000). In addition to showing that a condition precedent was not satisfied, an insurer must have also suffered prejudice. Id. at 327-28 (citing American Justice Insurance Reciprocal v. Hutchison, 15 S.W.3d 811, 817-18 (Tenn.2000)). The insured's failure to provide a duty in accordance with the policy creates a rebuttable presumption that the insurer has been prejudiced. Hutchison, 15 S.W.3d at 818 ("[W]hen an insured has failed to provide timely notice of a claim against it in accordance with a liability insurance policy, it is presumed that the insurer has been prejudiced by the breach."); Lester v. Allstate Prop. & Cas. Ins. Co., 743 F.3d 469, 471 (6th Cir. 2014) ("Tennessee presumes that a failure to participate in an examination results in prejudice to the insurance company, and makes it the policyholder's burden to demonstrate that the company suffered no harm.") (citing Talley v. State Farm Fire & Cas. Co., 223 F.3d 323, 328 (6th Cir.2000)); Brice v. Auto-Owners Ins. Co., No. 2:13-CV-339, 2016 WL 1633025, at *4 (E.D. Tenn. Apr. 21, 2016) ("The burden to show prejudice does not fall on the insurer. Instead, the insured's failure to perform a duty under an insurance policy gives rise to a rebuttable presumption that the insurance company has been prejudiced."). "The insured may rebut this presumption by proffering competent evidence establishing that the insurer was not prejudiced by the insured's delay." Hutchison, 15 S.W.3d at 818.

Here, the undisputed facts show that Plaintiffs breached the cooperation clause. The policy provided that Plaintiffs were to submit a signed, sworn statement of loss, an inventory, and receipts for additional living expenses within 60 days after Defendant requested that documentation. Defendant made repeated attempts to obtain the information and advised Plaintiffs how to obtain any

destroyed documents through third parties. When Plaintiffs initially submitted their proof of loss, they failed to list the amounts they were claiming under the insurance policy and failed to provide a complete inventory of personal property damaged by the fire. Plaintiffs also failed to produce the requested documents at the October 11, 2011 examinations under oath, as well as their 2009 and 2010 income tax returns. Plaintiffs also knew at that point that they would have to make a list of property items by memory.

Plaintiffs' January 1, 2012, proof of loss did not contain the amounts Plaintiffs were claiming, and the contents inventory failed to list or describe any of the damaged contents. Plaintiffs do not cite any evidence that they were prevented from obtaining these documents from third parties or that Defendant prevented them from entering their house. The testimony reflects that the fire marshal advised them not to reenter the house. Plaintiffs also could not state what steps that they took to recover the requested documents or authorization forms. Further, Plaintiffs admitted that they did not respond to Defendant's January 12, 2012 letter until June 17, 2013.

In sum, Plaintiffs have not introduced any evidence to rebut the presumption of prejudice against Defendant, and their contract claims should be dismissed for failing to comply with a condition precedent.

As to Plaintiffs' bad faith claim under Tenn. Code Ann. § 56-7-105, that section provides a twenty-five (25%) penalty for an insurer's bad faith refusal to pay amounts owed under a policy "in all cases when a loss occurs and they refuse to pay the loss within 60 days after a demand has been made by the holder of the policy." See Tenn. Code Ann. § 56-7-105(a). To recover under the statute, an insured must prove that:

(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

Palmer v. Nationwide Mut. Fire Ins. Co., 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986). To be sure,

> The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the imposing of the bad faith penalty.

Nelms v. Tennessee Farmers Mut. Ins. Co., 613 S.W.2d 481, 484 (Tenn. Ct. App.1978) (citations omitted). Further, "while the insurer owes a 'duty of exercising good faith and diligence in protecting the interest of its insured,' the insured owes a reciprocal duty of full co-operation." Parkway Associates, LLC v. Harleysville Mut. Ins. Co., 129 F. App'x 955, 960 (6th Cir. 2005) (quoting S. Fire & Cas. Co. v. Norris, 35 Tenn.App. 657, 250 S.W.2d 785, 790 (1952)).

Here, at the time of Plaintiffs' January 2013 demand, Plaintiffs' claim was not "due and payable" because Plaintiffs had failed to comply with their duties to cooperate after the loss and the policy's suit limitations period had expired. Thus, Plaintiffs' bad faith claim under Tenn. Code Ann. § 56-7-105 should be denied. See Thompson v. Fid. Mut. Life Ins. Co., 116 Tenn. 557, 92 S.W. 1098, 1104 (1906) ("Inasmuch as complainant, . . . is not entitled to recover the insurance, it follows, as a matter of course, she cannot recover any penalty for withholding it.")

As to Plaintiffs' claims under the Tennessee Consumer Protection Act and for negligence and unjust enrichment, Defendant, citing Tenn. Code Ann. § 56-8-113, contends that because Tennessee's bad faith statute provides the exclusive extra-contractual remedy for an insurer's bad

faith refusal to pay on a policy, all of Plaintiffs' extra-contractual claims fail as a matter of law. In response, Plaintiff contends that Tenn. Code Ann. § 56-8-113 does not apply because Plaintiffs' loss occurred on April 13, 2011 that was before § 56-8-113 took effect on April 29, 2011 and, in any event, § 56-8-113 does not apply to common law claims, such as negligence and unjust enrichment.

Tennessee Code Ann. § 56-8-113 became effective on April 29, 2011. That section provides:

Notwithstanding any other law, title 50 and this title shall provide the sole and exclusive statutory remedies and sanctions applicable to an insurer, person, or entity licensed, permitted, or authorized to do business under this title for alleged breach of, or for alleged unfair or deceptive acts or practices in connection with, a contract of insurance as such term is defined in § 56-7-101(a). Nothing in this section shall be construed to eliminate or otherwise affect any:

(1) Remedy, cause of action, right to relief or sanction available under common law;

(2) Right to declaratory, injunctive or equitable relief, whether provided under title 29 or the Tennessee Rules of Civil Procedure; or

(3) Statutory remedy, cause of action, right to relief or sanction referenced in title 50 or this title.

Id.

"Under § 56-8-113, the TCPA may not be used as a vehicle for an insurance action as it is found in title 47." Murphy v. Allstate Indem. Co., No. 1:13-CV-108, 2014 WL 1024165, at *4 (E.D. Tenn. Mar. 17, 2014); Davidoff v. Progressive Hawaii Ins. Co., No. 3:12-00965, 2013 WL 124353, at *1 (M.D. Tenn. Jan. 9, 2013) ("Plaintiffs' claims brought pursuant to the TCPA are barred as a matter of law."). "[A] TCPA claim accrues when the unlawful act or practice is discovered, thereby making the discovery rule applicable to such actions." Riad v. Erie Ins. Exch., 436 S.W.3d 256, 269 (Tenn. Ct. App. 2013). "Under the discovery rule, a TCPA cause of action accrues and the statute of limitations begins running 'when the plaintiff knows or in the exercise of reasonable care and

33

diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant.'" <u>Montesi v. Nationwide Mut. Ins. Co.</u>, 970 F. Supp. 2d 784, 789 (W.D. Tenn. 2013) (citations omitted).

Thus, based upon the record, because Plaintiffs did not discover any alleged TCPA violation until after April 29, 2011, § 56-8-113 bars Plaintiffs' TCPA claim.

Plaintiffs' claims for unjust enrichment and negligence, however, are common law claims and are not barred by § 56-8-113(1). <u>Davidoff</u>, 2013 WL 124353, at *2. Plaintiffs allege that Defendant failed to investigate properly and pay Plaintiffs' insurance claim. A negligence claim requires proof of the following five elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." <u>Biscan v. Brown</u>, 160 S.W.3d 462, 478 (Tenn. 2005). Here, the record does not support Plaintiffs' claim for negligence as Plaintiffs failed to provide Defendant with the requested documents to conduct its investigation prior to the expiration of the suit limitation. Accordingly, the Court concludes that this claim should be dismissed.

For an unjust enrichment claim, a plaintiff must prove that: "(1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." <u>Whitehaven Cmty. Baptist Church v. Holloway</u>, 973 S.W.2d 592, 596 (Tenn. 1998). There has not been any allegation that an insurance contract did not exist between the parties or that the contract became unenforceable or invalid. Thus, Plaintiffs' unjust enrichment claim should be dismissed. <u>Diana Asbury v. Lagonia Sherman, LLC</u>, No. W200101821COAR3CV, 2002 WL 31306691, at *5 (Tenn. Ct. App. Oct. 15, 2002) ("Because it

is undisputed that there was a contract between the parties, the trial court did not err in dismissing the claim of unjust enrichment.").

Accordingly, for these collective reasons, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 45) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this _18th_ day of July, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge